**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

_____

SALAH BAZZI,

                Plaintiff,

v.                                        Case No. 21-cv-10642

WAYNE STATE UNIVERSITY, et al.,

                Defendants.

_____/

**OPINION AND ORDER GRANTING IN PART DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AND TERMINATING AS MOOT DEFENDANTS' MOTION
FOR SANCTIONS**

Plaintiff Salah Bazzi brings fourteen federal and state law claims against

Defendants Wayne State University, Dr. Christopher Steffes, M.D., and Dr. Richard

Baker, M.D., all stemming from his dismissal as a student from the Wayne State

University School of Medicine ("WSUSOM"). (ECF No. 2.) Plaintiff chiefly alleges that he

did not receive appropriate due process before being dismissed from WSUSOM and

that his dismissal was the product of discrimination on the basis of race, color, national

origin and religion. (Id.) Pending before the court are two motions, Defendants' Motion

for Summary Judgment (ECF No. 28) and Defendants' Motion for Sanctions for

Plaintiff's Fabrication of Documents (ECF No. 27). Each has been fully briefed. The

court held oral argument for both filings on August 17, 2022. At the hearing's

conclusion, the court took the matters under advisement. Now, for reasons explained

below, the court will grant Defendants' summary judgment motion in part and terminate

as moot Defendants' sanctions motion.

# I. BACKGROUND[1]

## A. Policies and Procedures

WSUSOM confers a medical degree conditioned on a student's successful demonstration of various "domains of competency," including professionalism. (ECF No. 28-2, PageID.814, 903–11; ECF No. 28-3, 1035–58.) Professionalism, as defined in the WSUSOM M.D. Handbook and Policies, "includes honesty, respect for colleagues, faculty, staff and peers and behavior in public that is not embarrassing to the ideal of the physician." (ECF No. 28-2, PageID.904.) The handbook further categorizes unprofessional behaviors into four domains: (1) failure to engage; (2) dishonest behaviors; (3) disrespectful behaviors; and (4) poor self-awareness. (Id.) It additionally provides a lengthy, non-exhaustive list of examples of unprofessional behaviors for each domain, including the following:

> **Lack of Conscientiousness** - Students are expected to be thorough and dependable, and to commit the time and effort required to meet his or her responsibilities. Students should not require continual reminders about responsibilities to patients, to the institution, other health care professionals and to administrative staff. 1,2,3 [sic] Responding in a timely and appropriate fashion to phone calls, pages, notices and emails from faculty, nurses, other health care team members, and administrative staff is a responsibility that must be honored by students.

(Id. at 906–10.)

WSUSOM also has a Policies and Procedures Manual that dedicates an entire section to professionalism, emphasizing that appropriate professional behavior is expected of students both on and off campus. (ECF No. 28-3, PageID.1035–58.) The manual further identifies and defines "values and attributes [that] are at the core of the

---

[1] The facts in this section are undisputed, except where noted.

Professionalism standards for medical students at the School of Medicine." (Id. at PageID.1035.) They are: professional responsibility; competence and self-improvement; respect for others and professional relationships; honesty including academic integrity; personal responsibility; and social responsibility. (Id. at PageID.1035–36.)

A student's professionalism is reviewed as part of his course grade and as part of his behavior within the medical school community. (ECF No. 28-2, PageID.904.) Accordingly, a student can be cited for actions or behaviors that deviate from WSUSOM's established professional standards. (Id.) "The primary purpose of a citation for unprofessional behavior is for formative assessment, reflection, and opportunity for remediation." (Id.) WSUSOM has further devised a reporting process and intervention scheme for addressing "consistent or persistent patterns of unprofessional behavior" and/or "an egregious violation" of the school's professional standards. (Id.) This process is guided by the level of behavior, beginning with an "improvement plan," progressing to a "warning" and "mini-professionalism meeting," and culminating in a "Professionalism Committee Referral." (Id. at PageID.905–06.)

Any person can report the unprofessional behavior of students. (ECF No. 28-3, PageID.1037.) Once a report of unprofessional behavior is made, the appropriate dean initiates an investigation and holds a "fact-finding conference."[2] (Id.) Afterward, in consultation with the Associate Dean of Undergraduate Medical Education, the reviewing dean can decide to take no further action, recommend remediation, refer the student to the Professionalism Committee for a formal hearing, or refer the student to

---

[2] Cases that fall under the Wayne State University Student Code of Conduct are referred to the University Dean of Students Office and handled with different procedures irrelevant to this case. (ECF No. 28-3, PageID.1037.)

the University to be investigated further through the Student Code of Conduct procedure. (Id.) Direct referrals to the Professionalism Committee occur when the alleged unprofessional behavior violates one of WSUSOM's core professionalism values. (Id. at PageID.1038.) Records of the investigation and disposition of cases are kept, generally as part of the comments section of WSUSOM's Student Tracking Advising Retention System ("STARS"). (Id.)

The Professionalism Committee "is responsible for monitoring medical student professionalism behavior and for promoting the development of professionalism." (ECF No. 28-3, PageID.1038.) It is composed of a chairperson appointed by the Vice Dean for Medical Education, eight faculty members appointed by the Executive Committee of the Faculty Senate, and four students appointed by the Student Senate (Id.) While generally a non-voting member[3], the chairperson is responsible for coordinating matters involving professionalism issues, including any consequences for a professionalism breach, and answering questions concerning the procedure. (Id.) Students brought before the Professionalism Committee for a hearing are provided written and email notice, ten school days prior to the hearing. (Id. at PageID.1039.) The notice contains the reasons for the hearing, the nature of the evidence submitted, and the time and place of the hearing. (Id.) Students are further provided an opportunity to review all documents before the committee ten school days prior to the hearing, bring an advisor to the hearing, and appear (or decline to appear) before the committee. (Id.) Upon substantiating a complaint of unprofessional behavior, the Professionalism Committee

---

[3] The Chair only votes when a vote by a quorum of faculty members results in a tie. (ECF No. 28-3, PageID.1038.)

has a variety of sanctions at its disposal, including a referral to WSUSOM's Promotions Committee. (Id. at PageID.1040.) A student subject to sanctioning may request reconsideration of the sanction decision from the Promotions Committee Chair. (Id.)

The Promotions Committee is a sub-committee of the Faculty Senate. (ECF No. 28-3, PageID.1023.) It serves as WSUSOM's decision-making body "with regard to the promotions and graduation process and has the responsibility of determining the student's fitness and suitability for the study and practice of medicine." (Id.) Comprised of eight voting faculty members, four students, and four student alternates, and chaired by the Vice Dean for Medical Education, it is accountable for ensuring that WSUSOM policies and procedures are followed. (Id.) To that end, the committee convenes to determine the disposition of students who fail to meet WSUSOM professionalism standards. (Id. at PageID.1024.) The disposition options available to the committee range from employing additional requirements on a student for his success in medical school to outright program dismissal. (Id. at PageID.1023–24.)

Students facing the possibility of dismissal from WSUSOM are invited to appear for a hearing before the Promotions Committee "to ensure that all relevant data is available when the Committee makes its decision," which already includes pre-entry data, medical school transcript information, performance data from the current academic year, and information regarding any student issues which appear to have impaired academic or professional performance. (ECF No. 28-3, PageID.1024–25.) Students are provided with the same notice as that for Professionalism Committee hearings, albeit ten *business* days before the scheduled hearing. (Id.) Further, students are encouraged to submit a written statement, outlining their response to the reasons

for the hearing along with a plan for remediation. (Id. at PageID.1025.) At the hearing itself, a student may give a short oral presentation and answer questions from the committee members. (Id.) Deliberations then occur outside the student's presence, with the student being verbally informed of the ultimate decision the same day of the hearing and in writing within ten business days. (Id.) Similar to the Professionalism Committee proceedings, students can request reconsideration of the Promotions Committee's decision from the non-voting Chair, the Vice Dean of Medical Education, through a written statement. (Id.) If reconsideration is denied, a further appeal can be made in writing to the Provost of the University. (Id.)

### B. Plaintiff's Academic Record and Dismissal from WSUSOM

Plaintiff matriculated at WSUSOM in August of 2015 as part of a scholarship program administered by the United States Navy. (ECF No. 2, PageID.8; ECF No. 28, PageID.778.) As indicated by STARS records, his professionalism issues at WSUSOM appear as early as 2016, reflecting that he missed classes and counselor appointments, failed to appropriately communicate with administrative staff and professors, and contributed inconsistently in a group-based class. (ECF No.28-7, PageID.1239–48; ECF No. 28-10, PageID.1333; ECF No. 28-11, PageID.1345; ECF No. 28-8, PageID.1264.) These issues culminated in a meeting with Dr. Matthew Jackson, then-Chair of the Professionalism Committee, to discuss Plaintiff's professionalism issues. (ECF No. 28-7, PageID.1231; ECF No.28-9, PageID.1312.) Plaintiff's next professionalism woes began with his preparation for and taking of the required Step 1 of the United States Medical Licensing Examination. (ECF No. 28-8, PageID.1260–63; ECF No. 28-10, PageID.1323–32; ECF No. 28-11, PageID.1345.) Despite receiving a practice score that

WSUSOM policy deems sufficient for readiness to take Step 1, in June of 2017, Plaintiff opted to take a one-year leave of absence to better prepare himself for the examination. (Id.; ECF No. 28-9, PageID.1312.) While ultimately obtaining a passing score, Plaintiff failed to take Step 1 by his May 1, 2018 deadline and had to request an additional two-month leave of absence in June of 2018 to complete the examination, delaying the start to his third year of medical school. (Id.)[4]

Plaintiff's return from his fourteen-month leave of absence was also not without issue. To start third-year clinical rotations, WSUSOM students, who have been away from physical diagnosis training for more than two months, are required to complete a Clinical Readiness Exam ("CRA") at Kado Clinical Skills Center. (ECF No. 28-3, PageID.1063; ECF No. 28-12, 1347–52.) Students choose from one of six sessions to complete their CRA. (Id.) Plaintiff, after missing his first session on June 18, 2018, was permitted to reschedule to the final session date on July 9, 2018. (ECF No. 28-12, 1347–52.) On July 8, 2018, Plaintiff requested to reschedule his CRA a second time due to his being "really sun burned." (Id. at PageID.1352.) After a flurry of emails from Kado staff, WSUSOM faculty, and WSUSOM staff, Plaintiff acknowledged how he "truly inconvenienced" Kado staff and expressed gratefulness for WSUSOM's willingness to accommodate his self-professed "unprofessionalism." (Id. at PageID.1350.)

Nonetheless, professionalism problems continued throughout Plaintiff's  third year of medical school. In October of 2018, Plaintiff failed a surgery departmental examination. (ECF No. 28-9, PageID.1312.) This required him to schedule a re-take,

---

[4] These were deemed policy violations by Defendant Steffes. (ECF No. 28-9, PageID.1312.)

which he failed to do within the allotted time provided by WSUSOM policy. (Id.; ECF No. 28-11, PageID.1340.) He was further placed on an administrative leave of absence from October 22, 2018 through November 16, 2018 due to issues stemming from his obstetrics/gynecology (OB/GYN) rotation orientation. While Plaintiff attended much of his rotation orientation on October 22, 2018, including the mandatory session, he became ill in the afternoon and left early, asking his student-colleagues nearby to "spread the word." (ECF No. 28-7, PageID.1235–36; ECF No. 28-14, PageID.1363.) Under WSUSOM policy, Plaintiff should have immediately alerted his OB/GYN clerkship coordinator, Cathy Rutkowski, to his absence. (ECF No. 28-15, PageID.1373–77.) Instead, Ms. Rutkowski emailed Plaintiff about his absence before he notified her of the same. (ECF No. 28-14, PageID.1363–64.) Plaintiff's early departure also required him to get an excused absence from his counselor, Kathleen Connors. (ECF No. 28-15, PageID.1373–77.) Ms. Connors in turn required Plaintiff to provide medical documentation supporting his absence. (ECF No. 28-7, PageID.1235–36.) By October 26, 2018 at 1:51 p.m., Plaintiff had not submitted documentation to Ms. Connors, resulting in Defendant Steffes, in his capacity as Assistant Dean for Clinical Education, pulling Plaintiff from his OB/GYN rotation. (Id. at PageID.1220.)

While the parties dispute whether Plaintiff provided the documentation within a reasonable amount of time as required by WSUSOM policy, Plaintiff undisputedly did not forward the documentation to Ms. Connors until 6:19 p.m. on October 26, 2018, that is, after Plaintiff received notice that he was pulled from his rotation. (ECF No. 33-5, PageID.1589.) As a result of his OB/GYN rotation issues, on October 30, 2018, Plaintiff met with Ms. Connors and Defendant Steffes to discuss his professionalism, a potential

referral to the WSUSOM Professionalism Committee, and an action plan going forward. (ECF No.28-7, PageID.1221–22; ECF No. 28-11, PageID.1342.)

Yet, later in his third year, on April 15, 2019, Plaintiff missed another orientation for his Family Medicine rotation. (ECF No. 2, PageID.10.) Consequently, after meeting with Dr. Margit Chadwell in her capacity as Associate Dean of Student Affairs and Ms. Connors, Defendant Steffes made a formal referral of Plaintiff to the Professionalism Committee Chair, Dr. Jackson, detailing his professionalism issues since 2016. (ECF No. 28-9, PageID.1312; ECF No. 28-11, PageID.1339.) On April 24, 2019, Dr. Jackson notified Plaintiff via email that he was scheduled for a professionalism hearing on May 8, 2019. (ECF No. 28-7, PageID.1234.) Dr. Jackson further scheduled a meeting with Plaintiff on May 2, 2019 to discuss the hearing process and give Plaintiff the opportunity to review the documents that the Professionalism Committee would see. (Id.) On May 8, 2019, the Professionalism Committee convened to review Plaintiff's reported violations of WSUSOM's professionalism standards. (ECF No. 28-7, PageID.1223; ECF No. 28-8, PageID.1256–57.) Plaintiff provided a statement and answered questions. (Id.) On May 9, 2019, the committee issued its decision, resolving to refer Plaintiff's case to the Promotions Committee with a recommendation of dismissal. (ECF No. 28-7, PageID.1223.)

On June 17, 2022, Plaintiff met with Ms. Connors to prepare for his Promotions Committee Hearing. (ECF No. 28-11, PageID.1339.) On June 19, 2019, the Promotions Committee held a hearing in Plaintiff's case. (ECF No. 28-8, PageID.1254.) On June 20, 2019, the committee declined to adopt the Professionalism Committee's dismissal recommendation and "made the decision to grant [Plaintiff] one last opportunity to

complete [his] MD requirements by the summer of 2020." (ECF No. 28-19, PageID.1404.) Plaintiff was required to "demonstrate 100% adherence" to specific parameters, including "[m]andatory attendance and on-time completion of all assigned clinical clerkships and assignments." (Id.)

On July 9, 2019, Plaintiff met with Defendant Steffes, Dr. Chadwell, and Ms. Connors to discuss the parameters set forth by the Promotions Committee for Plaintiff to successfully graduate in 2020. (ECF No. 28-11, PageID.1338–39.) While Plaintiff disputes whether he had a choice in the matter, he agreed to abide by the committee's terms. (Id.; ECF No. 28-5, PageID.1129, 1135–36.) To that end, Plaintiff was required to complete his remaining third and fourth year work on a schedule provided by Defendant Steffes. (ECF No. 28-19, PageID.1404.) The two began formulating a schedule in September of 2019. (ECF No. 28-20, PageID.1406–07.) Plaintiff maintains that Defendant Steffes unilaterally registered him for courses different than the ones upon which they agreed and further failed to respond to Plaintiff's September 18, 2019 email seeking to clarify said scheduling issues. (ECF No. 33, PageID.1520.) However, the record reflects that Defendant Steffes did respond to Plaintiff the following morning on September 19, 2019, with no follow-up from Plaintiff. (ECF No. 34-2, PageID.1633.) Regardless, Plaintiff asserts that, due to Defendant Steffes' failure to respond, he attempted to modify his schedule to reflect the one to which they had agreed with Ms. Connors' approval. (ECF No. 28-5, PageID.1129–31.) In November of 2019, Plaintiff registered himself for an ER Ultrasound elective, set to commence in February of 2020. (ECF No. 28-20, PageID.1408–18.)

Plaintiff's fourth year of medical school progressed largely without incident until May of 2020 when WSUSOM faculty and staff discovered that Plaintiff failed to attend his ER Ultrasound elective.[5] (ECF No. 28-22, PageID.1425–27.) Plaintiff has offered several different, and at times conflicting, explanations for his absence. (ECF No. 28-5, PageID.1133–42.) He particularly blames the lack of a "welcome email" denoting the start of his course. (Id.) He also faults Laura Gibson, whom Plaintiff speculates is an employee of Defendants, misinforming the course preceptor, Dr. Brian Haber, as to Plaintiff's disenrollment. (ECF No. 33, PageID.1522.) Regardless, to salvage the situation and earn an official grade, Plaintiff texted and emailed with Dr. Haber directly, seeking to rotate under his supervision without formally registering for the class with WSUSOM. (ECF No. 28-5, PageID.1142–44; 28-24, PageID.1440–42.) While Dr. Haber was willing to provide Plaintiff with a remediation plan, Defendant Steffes did not allow Plaintiff to do so. (ECF No. 33-12, PageID.1614; ECF No. 33-14, PageID.1616–18.) In July of 2020, Plaintiff again tried unsuccessfully to obtain course credit for unofficially rotating in an outpatient internal medicine clinic. (ECF No. 28-5, PageID.1144; ECF No. 28-25, PageID.1444–48.) WSUSOM faculty and staff found Plaintiff's unofficial rotating to be unprofessional, while Plaintiff maintains that such "shadowing" was common. (ECF No. 28-25, PageID.1444–47; ECF No. 28-5, PageID.1149.)

Ultimately, with Plaintiff's graduation hanging in the balance, relevant faculty resolved to refer Plaintiff for a Promotion's Committee hearing "for deliberation and

---

[5] Certain mid-clerkship feedback during Plaintiff's November 2019 Emergency Medicine elective did prompt a meeting between Plaintiff and Dr. Sarkis Kouyoumjian regarding "some professionalism questions again," but no further action was taken. (ECF No. 28-7, PageID.1229.)

decision regarding his continued status with the medical education program." (Id.; ECF No. 28-29, PageID.1470.) As Chair of the Promotions Committee, on August 31, 2020, Defendant Baker issued Plaintiff a notice to appear for hearing on September 23, 2020. (Id.) The notice informed Plaintiff of the reason for the hearing, the hearing protocols, Plaintiff's opportunity to speak, possible outcomes, the right to a support person, and Plaintiff's appellate rights. (Id.) A synopsis of the September 23, 2020 Promotions Committee proceedings is captured in meeting minutes, reflecting the presentation of Plaintiff's academic profile, updated information from Defendant Steffes and Ms. Connors, Plaintiff's appearance, and discussion by the committee members. (ECF No. 28-9, PageID.1297–98.) The committee unanimously resolved to dismiss Plaintiff from WSUSOM "because he failed to adhere 100% to the parameters outlined in his Promotions letter dated June 20, 2019," and informed Plaintiff of the results the same day (Id. at PageID.1298, 1336.) On October 14, 2020, Plaintiff submitted a request for reconsideration to Defendant Baker. (ECF No. 28-4, PageID.1068–84.) On February 19, 2021, Defendant Baker denied reconsideration and informed Plaintiff of his right to appeal the decision to the Provost. (ECF No. 28-31, PageID.1475.)

Plaintiff did not appeal to the Provost, choosing instead to file suit on March 25, 2021. (ECF No. 28-5, PageID.1175; ECF No. 2.) In his Complaint, Plaintiff alleges fourteen claims: Count I, Violation of Procedural Due Process Guaranteed by the United States Constitution (For failure to give required notice), as to all Defendants; Count II, Violation of Procedural Due Process Guaranteed by the United States Constitution (For failure to give a hearing), as to all Defendants; Count III, Violation of Plaintiff's Fourteenth Amendment Right to Equal Protection Under the Law, as to all Defendants;

Count IV, Discrimination Prohibited by Title VI, as to Defendant WSU; Count V,

Declaratory Action, as to all Defendants; Count VI, Violation of Procedural Due Process

Guaranteed by the Michigan Constitution (For failure to give a hearing), as to all

Defendants; Count VII, Violation of Procedural Due Process Guaranteed by the

Michigan Constitution (For failure to give notice), as to all Defendants; Count VIII,

Breach of Contract, as to Defendant WSU; Count IX, Promissory Estoppel, as to

Defendant WSU; Count X, Unjust Enrichment, as to Defendant WSU; Count XI,

Fraudulent Misrepresentation, as to Defendant WSU; Count XII, Intentional and/or

Grossly Negligent Infliction of Emotional Distress, as to Defendant WSU; Count XIII,

Discrimination Prohibited by the Michigan Elliott-Larsen Civil Rights Act, as to

Defendant WSU; and Count XIV, Declaratory Action, as to all Defendants. (ECF No. 2,

PageID.16–47.) Defendants presently seek summary judgment on all counts.

## II. DISCUSSION
### A. Motion for Summary Judgment

To prevail on a motion for summary judgment, a movant must show that "there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). First, the moving party bears the initial burden of

presentation that "demonstrate[s] the absence of a genuine issue of material fact."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no requirement, however,

that the moving party "support its motion with [evidence] negating the opponent's claim."

*Id.* (emphasis removed); *see also Emp'rs Ins. of Wausau v. Petrol. Specialties, Inc.*, 69

F.3d 98, 102 (6th Cir. 1995).

Second, "the nonmoving party must come forward with 'specific facts showing

that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 587 (1986) (emphasis removed) (quoting Fed. R. Civ. P. 56(e)).

This requires more than a "mere existence of a scintilla of evidence" or "'[t]he mere

possibility of a factual dispute." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252

(1986); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992). For a court to deny

summary judgment, "the evidence [must be] such that a reasonable [finder of fact] could

return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. All reasonable

inferences from the underlying facts must be drawn "in the light most favorable to the

party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962);

*Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015).

Defendants seek dismissal of all counts against them, as well as attorney fees

and costs under 42 U.S.C. § 1988. In support of their summary judgment motion,

Defendants make five general arguments. The court will evaluate each in turn.

### 1. Sovereign Immunity

Defendants first argue that Plaintiff's state law claims, Counts VI through XIV,

must be dismissed based on Eleventh Amendment sovereign immunity principles to the

extent that they seek monetary damages from or retroactive injunctive relief against

Defendant WSU, an arm of the state of Michigan, and the individual Defendants in their

official capacities. (ECF No. 28, PageID.789–90.) Plaintiff does not dispute the fact of

Defendants' sovereign immunity, but asserts, without citing supporting authority, that

Defendants waived their sovereign immunity by waiting so long to bring the defense

before the court in a formal motion. (ECF No. 33, PageID.1524.) Defendants refute this

contention, pointing to their assertion of sovereign immunity as an affirmative defense,

both in their Answer (ECF No. 5, PageID.120) and in the parties' joint discovery plan (ECF No. 10, PageID.136, 140). (ECF No. 34, PageID.1623.)

"Although a state agency may waive its sovereign immunity and consent to suit by voluntarily appearing and defending against the merits of a case in federal court, [courts] have not required an agency to make a full-throated assertion of its immunity in its initial dealings with the court to avoid waiver." *Brent v. Wayne Cty. Dep't of Hum. Servs.*, 901 F.3d 656, 682 (6th Cir. 2018) (citing *Boler v. Earley*, 865 F.3d 391, 410–11 (6th Cir. 2017)). In *Brent*, the Sixth Circuit found no waiver occurred when the defendant agency "undeniably invoked its sovereign immunity in its initial motion for summary judgment, and failed only to support adequately this invocation with sufficient argument or evidence." *Id.* at 683. This case is analogous to *Brent*, as Defendants raised the defense affirmatively in both their Answer and joint discovery plan, while fully briefing the issue in their summary judgment motion. As such, to the extent that Plaintiff seeks monetary damages or retroactive injunctive or declaratory relief from Defendants in Counts VI through XIV, they will be dismissed on sovereign immunity grounds.[6]

## 2. Procedural Due Process

Defendants next argue that Plaintiff's procedural due process claims, Counts I, II, VI, and VII, fail because there is no protected property interest in his academic dismissal and, even if there were, Plaintiff received more than sufficient due process. (ECF No. 28, PageID.791–801.) Defendants further contend that Plaintiff's failure to exhaust the appellate process available to him, namely various grade appeals and an

---

[6] Because Defendants Steffes and Baker were sued only in their official capacities, sovereign immunity extends to them as well. *Kentucky v. Graham*, 473 U.S. 159, 165–68 (1985).

appeal to the Provost, is an additional ground for dismissal. (ECF No. 28, PageID.800–01.)

Plaintiff counters that the Sixth Circuit has in fact determined that university students are entitled to some level of due process before severe disciplinary actions, like expulsion, are taken against them. (ECF No. 33, PageID.1525–26.) He further characterizes the Professionalism and Promotions Committees' hearings as "after-the-fact ratifications of disciplinary decisions made and executed by Defendant Steffes," resulting in Plaintiff being "unfairly held to an impossible standard, which was to obey a laundry list of terms which would have been extremely difficult under normal circumstances, but then which Defendants then forced Plaintiff to violate." [sic] (Id. at PageID.1526–27.) Specifically, Plaintiff points to: (1) Defendant Steffes registering Plaintiff for a different schedule than that upon which they agreed and stopping communication with Plaintiff on the subject; (2) "sabotage" by Defendants' alleged employee, Laura Gibson, such that Dr. Haber did not send Plaintiff notice of his ultrasound course; and (3) the requirement for newly discovered information, which he did not have at the time, for a successful appeal, thereby making exhaustion of his appellate rights a futile endeavor. (Id. at PageID.1527–28.)

"Prevailing on a procedural due process claim requires first establishing the existence of a constitutionally protected life, liberty or property interest." *McGee v. Schoolcraft Comm. College*, 167 Fed. App'x 429, 437 (6th Cir. 2006) (citing *Bd. of Regents v. Roth,* 408 U.S. 564 (1972)). Here, Plaintiff asserts a property interest in a WSUSOM doctorate degree. (ECF No. 2, PageID.20, 23, 32, 34.) "In this Circuit, [courts] have held that the Due Process Clause is implicated by higher education

disciplinary actions." *Flaim v. Med. College of Ohio*, 418 F.3d 629, 633 (6th Cir. 2005); *Jaksa v. Regents of Univ. of Mich.*, 597 F. Supp. 1245 (E.D. Mich. 1984), *aff'd*, 787 F.2d 590 (6th Cir.1986) (finding due process clause implicated in suspension from university for cheating). The amount of process due varies based on the circumstances of a particular case. *See Matthews v. Eldridge*, 424 U.S. 319 (1976). Assuming without deciding the existence of a property interest in pursuing a medical career, the Supreme Court in *Bd. Of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 84–86 (1978), found that "a significant difference between the failure of a student to meet academic standards and the violation by a student of valid rules of conduct" exists—a difference that "calls for far less stringent procedural requirements in the case of an academic dismissal."

Here, Plaintiff's dismissal as a medical student for lack of professionalism is a failure to meet academic standards. *Al-Dabagh v. Case Western Reserve Univ.*, 777 F.3d 355, 359–60 (6th Cir. 2005). In the context of academic dismissal, procedural due process does not require a formal hearing before a decision-making body either before or after the termination decision is made. *See Horowitz*, 435 U.S. at 86–91; *Fuller v. Schoolcraft College*, 909 F. Supp. 2d 862, 876 (E.D. Mich. 2012) (Murphy, J.); *Eid v. Wayne State Univ.*, -- F. Supp. 3d ---, 2022 WL 1172142, at *15 (E.D. Mich. Apr. 20, 2022) (Drain, J.). Courts are required to "show great respect for the faculty's professional judgment" and "may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985). Thus, "[i]n the case of an academic dismissal

or suspension from a state educational institution, when the student has been fully informed of the faculty's dissatisfaction with the student's academic progress and when the decision to dismiss was careful and deliberate, the Fourteenth Amendment's procedural due process requirement has been met." *Ku v. State of Tenn.*, 322 F.3d 431, 436 (6th Cir. 2003) (citing *Horowitz*, 435 U.S. at 85–86).

Here, there is no genuine issue of material fact as to whether Plaintiff received adequate procedural due process prior to his dismissal from WSUSOM. Undisputedly, Plaintiff had professionalism issues. Before being dismissed, Plaintiff participated in three hearings—one before the Professionalism Committee and two before the Promotions Committee—for which he received notice, detailing the hearing's purpose and procedures, as well as an opportunity to prepare with WSUSOM faculty and/or staff. (ECF No. 28-7, PageID.1223; ECF No. 28-8, PageID.1256–57; ECF No. 28-19, PageID.1404; ECF No. 28-9, PageID.1297–98.) These hearings were in addition to numerous, informal meetings between Plaintiff and Defendant Steffes and/or Ms. Connors, as well as other faculty at times. (*See* ECF No. 28-11, PageID.1336–45.) Every hearing or meeting concerned Plaintiff's persistent professionalism issues, originating as early as 2016. (Id.) As such, the record is clear that Plaintiff was fully informed as to WSUSOM faculty's dissatisfaction with his compliance with WSUSOM's professionalism standards. Moreover, the meeting minutes and/or follow-up letters to Plaintiff from the committee hearings reflect that the Promotions Committee's ultimate decision to dismiss was careful and deliberate. (ECF No. 28-7, PageID.1223, 1225; ECF No. 28-8, PageID.1256–57; ECF No. 28-9, PageID.1278, 1294, 1297–98; ECF No. 28-31, PageID.1475–76.) Most compelling is the Promotions Committee's June 20,

18

2019 "last chance" letter, which declined to administratively dismiss Plaintiff, as recommended by the Professionalism Committee, and provided him with the specific parameters necessary to reach graduation. (ECF No. 28-19, PageID.1404.)

Plaintiff claims that Defendant Steffes' decision to pull him from his October 2018 OB/GYN rotation was wrong, that the Promotions Committee imposed an "impossible standard" on him, and that the committee erred in dismissing him based on his failure to attend his February 2020 ER Ultrasound rotation, for which he blamed Defendants (ECF No. 33, PageID.1525–28.) However, Plaintiff has presented no evidence, let alone a genuine issue of material fact, establishing "a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Ewing*, 474 U.S. at 225. Essentially, Plaintiff is seeking for the court to substitute its judgment for that of the WSUSOM faculty and staff. Plaintiff's mere beliefs do not support his conclusory allegation that his "disciplinary proceedings were" "rubber-stampings" of Defendant Steffes' decisions, and the records reflect otherwise. (Id. at PageID.1528.) The Promotions Committee found Plaintiff's excuses for missing his ultrasound course unconvincing against the backdrop of his full academic record. Given the deference owed to WSUSOM under these circumstances, the court finds no reason now to disturb its professional judgment.

Accordingly, Defendants are entitled to summary judgment on Plaintiff's procedural due process claims under U.S. Constitution (Counts I and II). To the extent that Count VI and VII allege state due process claims, presumably under Article 1, § 17 of the Michigan Constitution, they are dismissed for the same reasons. *Vigil v. Regents of Univ. of Mich.*, 980 F. Supp. 2d 790, 804 (E.D. Mich. 2013) (applying same analysis

to due process claims under federal and Michigan state Constitutions), *aff'd*, 609 F. App'x 349 (6th Cir. 2015). Moreover, Defendants Steffes and Baker are entitled to qualified immunity as to Plaintiff's § 1983 claims contained within Counts I and II. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

### 3. Alleged Equal Protection Violation & Discrimination

Defendants next argue that Plaintiff's Equal Protection Clause claim (Count III) and related discrimination claims under Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d *et seq.*, (Count IV), and Michigan's Elliott-Larsen Civil Rights Act, Mich. Comp. Laws §§ 37.2101 *et seq.*, (Count XIII), fail because Plaintiff has not and cannot present proper comparator evidence. (ECF No. 28, PageID.802.) Defendants further contend that, even if Plaintiff could produce such evidence, he cannot demonstrate the requisite pretext to survive summary judgment. (Id. at PageID.803.)

Plaintiff counters that he does not need to present comparator evidence because his situation is unique. (ECF No. 33, PageID.1528–29.) As such, Plaintiff contends that he need only show strong circumstantial evidence of disparate treatment, that is, that others were not disciplined for misconduct of comparable seriousness. (Id.) He points to deposition testimony of Defendant Steffes, Defendant Baker, Ms. Connors, and Ms. Rutkowski, which indicate that other students were allowed to make up missed days of class, unlike Plaintiff during his OB/GYN rotation from which Defendant Steffes unilaterally pulled him. Plaintiff asserts that this is evidence of Defendant Steffes'

disparate treatment of him because of his protected characteristics as a non-white Arab of Lebanese origin.[7] (Id. at PageID.1530.)

To make a *prima facie* case for his discrimination claims, Plaintiff must establish that (1) he is a member of a protected class, (2) he suffered an adverse action,[8] (3) he was qualified for the position, and (4) he was treated differently than similarly situated, non-minority medical students. *See Johnson v. University of Cincinnati*, 215 F.3d 561, 572–73 (6th Cir.2000).[9] The central dispute at bar is whether Plaintiff can demonstrate that he was treated differently from other students outside his protected class in his dismissal process. Plaintiff has failed to establish a genuine issue of material fact on this point. The record is entirely devoid of comparator evidence. The mere fact that other

---

[7] Plaintiff alleges discrimination based on race, color, and national origin. (ECF No. 2, PageID.25–26, 28, 44.) However, he also claims that Defendants would not have brought a "non-Muslim" medical student before the Promotions Committee for "merely missing part of a course." (ECF No. 2, PageID.26, 28, 44.) It is unclear to the court whether Plaintiff is also making a religious discrimination claim. Regardless, such a claim would fail for the same reasons why Plaintiff's other discrimination theories fail.

[8] The Complaint alleges that the specific "adverse action" was "withholding Plaintiff's doctorate of medicine and/or dismissing Plaintiff from [Defendants'] program" when "Plaintiff had more than met all the requirements for obtaining his doctorate of medicine, save for three weeks of a single course which Defendant wrongfully obstructed him from completing." (Id. at PageID.25–26, 28, 43.) Based on the record evidence, the court can only presume that the Complaint is referencing the ER Ultrasound course. Yet, in his response, Plaintiff identifies Defendant Steffes pulling him from his October 2018 OB/GYN rotation as disparate treatment. (ECF No. 33, PageID.1530.) He also seems to suggest, in a footnote, that the Promotions Committee's "last chance" letter was further disparate treatment. (Id.) Because Plaintiff's claim fails for other reasons, the court need not and will not address these discrepancies.

[9] "[Courts] look to cases involving claims of disparate treatment under Title VII for guidance in the equal-protection analysis." *Toth v. City of Toledo*, 480 F. App'x 827, 832 (6th Cir. 2012) (citations omitted). Claims under the Elliott-Larsen Civil Rights Act also mirror Title VII actions. *Booker v. Brown & Williamson Tobacco Co., Inc., 879 F.2d 1304, 1311–12 (6th Cir. 1989)*.

medical students have been permitted to complete their courses after missing some portions does not provide Plaintiff with the *prima facie* proof required by the circumstances of this case. Rather, because his dismissal was premised on a review of his entire academic record, even if the court assumes without accepting that he was "unique," Plaintiff would need to present evidence that a non-Lebanese or non-Muslim medical student with a similar record of professionalism issues was permitted to graduate. He has not done so. As such, Defendants are entitled to summary judgment on Plaintiff's discrimination claims.

### 4. Intention Infliction of Emotional Distress

Defendants also seek summary judgment as to Plaintiff's intentional infliction of emotional distress claim, asserting that he cannot claim Defendants' conduct was outrageous when he admitted to the Promotions Committee that he would vote to dismiss if in their shoes. (ECF No. 28, PageID.803–04; see ECF No. 28-9, PageID.1297.) Plaintiff counters that Defendants' conduct in this case "was absolutely extreme and outrageous," as it "put Plaintiff through the wringer, mentally and emotionally." (ECF No. 33, PageID.1531.)

The court has already determined this claim to be barred by sovereign immunity and need not conduct further analysis, especially as both parties largely provide conclusory statements in support of their respective positions.

### 5. Qualified Immunity

Defendants' final argument concerns the individual Defendants, Dr. Steffes and Dr. Baker, and their entitlement to qualified immunity on all relevant counts. (ECF No. 28, PageID.803–05.) Plaintiff counters that such immunity is not owed to Defendants,

regurgitating much of the same arguments he already advanced under his due process and equal protection arguments. (ECF No. 33, PageID.1531–34.) For reasons already discussed, Plaintiff has failed to make a *prima facie* showing with respect to all of his constitutional claims, thereby entitling the individual Defendants to qualified immunity.

### 6. Costs & Attorney Fees

Finally, Defendants seek an award of attorney fees and costs under 42 U.S.C. § 1988, arguing that Plaintiff's action is frivolous, unreasonable, and without foundation. (ECF No. 28, PageID.806.) Plaintiff has neglected to directly address Defendants' request. The court is therefore at liberty to treat Plaintiff's failure as a concession. *Fed. Nat'l Mortg. Ass'n v. River Houze, LLC*, -- F. Supp. 3d --, 2022 WL 989459, at *6 (E.D. Mich. 2022) (Drain, J.); *see Humphrey v. U.S. Attorney Gen.'s Office*, 279 Fed. App'x 328, 331 (6th Cir. 2008). Nonetheless, the court can only presume that, based on his arguments as a whole against Defendants' summary judgment motion and related sanctions motion discussed *infra*, Plaintiff would counter that his suit is meritorious.

An award of reasonable attorney fees and costs to the prevailing party in an action involving 42 U.S.C. § 1983 and Title VI claims is a matter of judicial discretion. 42 U.S.C. § 1988(b). However, where, as here, the prevailing party is a defendant, such an award is only rendered in truly egregious cases of misconduct when the underlying action is frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith. *Riddle v. Egensperger*, 266 F.3d 542, 547 (6th Cir. 2001); *Fox v. Vice*, 563 U.S. 826, 836 (2011); *Christiansburg Garment Co. v. Equal Employ't Opportunity Comm'n*, 434 U.S. 412, 421 (1978).

"[T]he relevant purpose of § 1988 is to relieve defendants of the burdens associated with fending off frivolous litigation," *Fox*, 563 U.S. at 836, while also "enabl[ing] civil rights plaintiffs to employ reasonably competent lawyers without cost to themselves." *Venegas v. Mitchell*, 495 U.S. 82, 83 (1990). When determining whether a plaintiff's action is frivolous, unreasonable, or without foundation, the Supreme Court cautions as follows:

> [I]t is important that a district court resist the understandable temptation to engage in post hoc reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation. This kind of hindsight logic could discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success. No matter how honest one's belief that he has been the victim of discrimination, no matter how meritorious one's claim may appear at the outset, the course of litigation is rarely predictable. Decisive facts may not emerge until discovery or trial. The law may change or clarify in the midst of litigation. Even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit.

*Christiansburg Garment Co.*, 434 U.S. at 421–22. As such, when considering the frivolity of an action, courts review whether the issues raised are those of first impression requiring judicial resolution, whether the controversy is based upon a real threat of injury to the plaintiff, and the record itself. *Garner v. Cuyahoga Cty. Juvenile Court*, 554 F.3d 624, 636 (6th Cir. 2009).

While the court appreciates that substantial pecuniary and reputational stakes likely motivated Plaintiff's filing, it is nevertheless initially inclined to agree with Defendants that Plaintiff's suit lacks merit for reasons thoroughly discussed in the court's substantive analysis. To begin with, nine of Plaintiff's fourteen claims were barred by sovereign immunity. Further, none of the issues presented to the court in the other five claims were novel. Rather the due process owed to a student facing dismissal

and the type of evidence needed for a *prima facie* case of discrimination are clearly established. Perhaps more importantly, the court would be remiss if it did not note its serious concerns with Plaintiff's ability to tell the truth. The record clearly reflects Plaintiff's near-constant mischaracterization of reality when confronted with the consequences of his unprofessionalism as well as his tendency to blame everyone and everything else instead of his own actions when so cornered. Plaintiff's suit is an example of this. By inaccurately hyper-focusing on his October 2018 OB/GYN rotation and his missed February 2020 ER Ultrasound as the sole reasons for his dismissal, Plaintiff's Complaint distorts what record actually informed Defendants' dismissal of him, namely an entire academic record with near constant professionalism issues. Plaintiff further does not deny any of his other, numerous professionalism issues, ignoring them entirely in his response. Additionally, without a shred of evidence beyond his simple belief that he was discriminated against[10], Plaintiff launches incredibly serious allegations that he was dismissed because of his Lebanese, Muslim profile.

Accordingly, due to the apparent frivolity of Plaintiff's action from the outset of his case, Defendants would seemingly be entitled to an award of reasonable attorney fees and costs. However, rather than so award Defendants, the court instead orders Plaintiff to show cause why he should not be responsible under 42 U.S.C. § 1988. Plaintiff is instructed to file a memorandum addressing the concerns set forth by the court specifically as it relates to an award under 42 U.S.C. § 1988 within twenty-one days of

---

[10] When asked to identify who specifically discriminated against him based on his being Muslim or Lebanese, Plaintiff testified that Defendant Steffes did so, "[t]hrough all the examples I stated earlier, just meeting with him in person, all the conversations we had. He was – he's very assertive towards me. I – I get if he didn't like me or whatever, but I just feel like sometimes it was a bit much." (ECF No. 28-5, PageID.1150.)

this order. Upon Plaintiff's filing, Defendants will have twenty-one days to file a
responsive memorandum. Defendants are advised to attach an accounting of their
reasonable attorney fees and costs with a proposed award amount.

### B. Motion for Sanctions

Defendants' motion for sanctions (ECF No. 27) seeks dismissal on separate,
discovery-related grounds. In light of the court's rulings with respect to Defendants'
summary judgment motion, however, Defendants' sanctions motion is essentially moot,
as the dismissal sought has been granted.[11]

### III. CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment (ECF
No. 28) as to all fourteen counts of Plaintiff's claim is granted while Defendant's motion
for sanctions (ECF No. 27) is denied. Immunity, both sovereign and qualified, bars the
bulk of Plaintiff's claims. To the extent that it does not, there remains no genuine issue
of material fact as to whether Plaintiff was afforded sufficient due process under the
circumstances or whether he was discriminated against on the basis of race, national
origin, or religion. As such, Defendants are the prevailing party under 42 U.S.C. § 1988.
However, the court will delay ruling on whether Defendants are entitled to an award of

---

[11] With that said, the thrust of the motion is not lost on the court. While Plaintiff
thoroughly disputes that he produced falsified records in discovery, the court finds the
argument disingenuous. By creating some distinction between formal and informal
discovery requests, Plaintiff seems to believe that veracity rules attendant to the
discovery process lapse, thereby empowering him to recreate notes for his Promotions
Committee hearing from memory despite testifying to his complete lack of memory
regarding the very same events. The court is further disturbed by Plaintiff's counsel's
characterization of this behavior as inconsequential. (*See* ECF No. 33, PageID.1540.)
Such an attitude reflects a disdain for following rules that in turn ensure the
accountability of the professionals governed by them. Plaintiff's side is strongly advised
against future improper action in this litigation or any other.

reasonable attorney fees and costs until Plaintiff files a memorandum on the issue. In this respect only is Defendants' summary judgment motion unresolved. Finally, while the court could have exercised its discretion to sanction Plaintiff for his wrongful conduct during discovery in this case, it declines to do so. Accordingly,

IT IS ORDERED that Defendants' Motion for Summary Judgment (ECF No. 28) is GRANTED IN PART to the extent that Plaintiff's substantive claims are resolved in Defendants' favor with the only issue remaining being an award under 42 U.S.C. § 1988.

IT IS FURTHER ORDERED that, within twenty-one days of this order, Plaintiff shall show cause through a filed memorandum as to why Defendants should not be awarded reasonable attorney fees and costs under 42 U.S.C. § 1988(b). Defendants may file a responsive memorandum within twenty-one days of Plaintiff's filing.

IT IS FURTHER ORDERED that Defendants' Motion for Sanctions for Plaintiff's Fabrication of Documents (ECF No. 27) is TERMINATED AS MOOT.


s/Robert H. Cleland                              /
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  January 3, 2023

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, January 3, 2023, by electronic and/or ordinary mail.


s/Lisa Wagner                                    /
Case Manager and Deputy Clerk
(810) 292-6522


S:\Cleland\Cleland\EKL\Opinions & Orders\Civil\21-10642.BAZZI.RevisedMSJandMotionForSanctions.EKL.docx